JORDAN WELLS (SBN 326491)
jwells@lccrsf.org
VICTORIA PETTY (SBN 338689)
vpetty@lccrsf.org
Lawyers' Committee for Civil Rights
of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 543-9444

*Pro Bono* Attorney for Petitioner

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| TIA JIJI,<br><br>Petitioner,<br><br>v.<br><br>JAMES JANECKA, Warden of Adelanto ICE Processing Center; THOMAS GILES, ICE Enforcement and Removal Operations, Los Angeles Field Office Director; DAVID VENTURELLA, Acting Director of United States Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary of the United States Department of Homeland Security; TODD BLANCHE, Attorney General of the United States, each sued in their official capacities,<br><br>Respondents. | Case No. 5:26-cv-6286<br><br>**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS** |

**INTRODUCTION**

1. Petitioner Tia Jiji ("Petitioner" or "Tia") is a 26-year-old woman who has spent nearly twelve years doing exactly what the United States asked of her. She arrived in December 2014 as a fifteen-year-old girl, admitted on a visitor visa and traveling with her mother and younger sister, after her family fled brutal persecution in the Democratic Republic of Congo. At its worst, militants entered Tia's family home demanding to know her father's whereabouts, burned Tia, then locked Tia and her siblings in a thin-walled closet where they bore witness their mother's torture. Within months of the family's escape and arrival in the United States, Tia's mother filed an affirmative asylum application that lists Tia and her siblings as derivative beneficiaries. The government has had that application for more than eleven years and still has not decided it.

2. In the meantime, Tia grew up here, in full view of the federal government. She studied theater, film, and writing at Santa Monica College. She performed poetry and honed her craft with a Black nonprofit arts organization in Los Angeles. While pursuing her artistic dreams, she worked as a server, a barista, and this year she toured the country as the merchandise manager for a soul-jazz band. She applied for and renewed her own work permit for a decade, gave her fingerprints to the government, paid federal taxes every year, and flew domestically more than ten times—passing through federal airport security under her own name each time. She has never been arrested. In June 2026, she traveled to New Orleans to appear in person for her family's asylum interview before United States Citizen and Immigration Services.

3. About four months after attending her USCIS asylum interview, on October 13, 2026, shortly after Tia cleared security at Los Angeles International Airport for a trip to New York with her younger sister, at least five plainclothes officers were waiting for her outside the restroom. They checked both sisters' identification, led Tia alone into an elevator, told Tia she had "overstayed [her] welcome," and handcuffed her—draping her own sweater over the cuffs as they walked her out through the arrivals level to a waiting van. No one showed her a warrant. No one gave her a single document. Hours later, the ICE officer who interviewed her confirmed that her family's asylum case was pending, told her that "the laws are changing," such that Tia and her

family needed to seek asylum in her country of origin.[1] Tia was ultimately transported to Adelanto ICE Processing Center, where she remains detained.

4. More than a week later, Tia still has not been served with a Notice to Appear, a warrant for her arrest, or any custody determination, and her case does not appear in the immigration court's case system. The Constitution does not permit the government to take a young woman who has done everything it asked, lock her in a detention center, and decide afterward whether it has a reason. Neither does the statute ICE must rely on to hold her: courts have repeatedly ordered immediate release where, as here, ICE detained a person under 8 U.S.C. § 1226(a) without a warrant, a Notice to Appear, or an individualized custody determination.

5. Tia's case is not novel. On at least ten occasions in the last two months, eight different judges of this District have held that the Due Process Clause forbids exactly what Respondents did here: arresting and jailing a noncitizen who was lawfully admitted to the United States, has an asylum application pending, and has no criminal record, without notice or a hearing first. In every one of those cases, the court ordered the petitioner's immediate release. Five of those cases, like Tia's, involved arrests of travelers at Southern California airports. *See, e.g.*, *Ren v. Janecha*, No. 5:26-cv-04364-AJR, 2026 WL 2413320 (C.D. Cal. Aug. 17, 2026); *Yao v. Janecka*, No. 5:26-cv-04735-DTB, 2026 WL 2666861 (C.D. Cal. Sept. 10, 2026); *Tang v. Mullin*, No. 5:26-cv-04881-KES, 2026 WL 2666872 (C.D. Cal. Sept. 10, 2026); *Lyu v. Janecha*, No. 5:26-cv-05051-MBK, 2026 WL 2681631 (C.D. Cal. Sept. 13, 2026); *Cardenas v. Giles*, No. 8:26-cv-02322-

---

[1] Neither Tia's immigration status nor any change in the law disqualifies her from seeking asylum from within the United States. The Refugee Act of 1980 provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Congress enacted that provision to bring United States law into conformity with the Nation's obligations under the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, which incorporates the substantive provisions of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987). Neither the statute nor the Convention requires a refugee to seek protection at the border or from abroad. A noncitizen already living in the United States may apply affirmatively with USCIS, as Tia's mother did here, *see* 8 C.F.R. § 208.2(a), and she did so within months of the family's arrival, well within the one-year filing deadline, 8 U.S.C. § 1158(a)(2)(B).

ACCV, 2026 WL 2722730 (C.D. Cal. Sept. 14, 2026); *Cong v. Mullin*, No. 5:26-cv-04899-DFM, 2026 WL 2692173 (C.D. Cal. Sept. 14, 2026); *Liping Lin v. Janecha*, No. 5:26-cv-04918-DFM, 2026 WL 2692175 (C.D. Cal. Sept. 14, 2026); *Xin Lin v. Janecha*, No. 5:26-cv-04915-DFM, 2026 WL 2743118 (C.D. Cal. Sept. 16, 2026); *Hakobyan v. Semaia*, No. EDCV 26-2496-AS, 2026 WL 2985380 (C.D. Cal. Oct. 5, 2026); *Ma v. Warden of Adelanto ICE Processing Ctr*., No. EDCV 26-05707-KK-DFMx, 2026 WL 3034590 (C.D. Cal. Oct. 8, 2026). The same result should follow here.

6. Petitioner therefore respectfully seeks a writ of habeas corpus (1) ordering Respondents to immediately release her from her ongoing, unlawful detention without any new conditions, including imposing default ankle monitoring devices, (2) requiring Respondents to return all of Petitioner's personal property confiscated during her arrest and detention, including her identification card, and (3) prohibiting Petitioner's re-arrest without Respondents first providing a hearing before a neutral decisionmaker at which Respondents bear the burden of proving by clear and convincing evidence that Petitioner is a danger or a flight risk, considering alternatives to detention and Petitioner's financial capacity to pay a bond amount.

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), and the Fifth Amendment to the U.S. Constitution.

8. Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(a) and 28 U.S.C. § 1391(b)(2) and (e)(1) because Petitioner is physically detained within this District, at the Adelanto ICE Processing Center in San Bernardino County, California.

## PARTIES

9. Petitioner Tia Jiji ("Petitioner" or "Tia") has lived in the United States since she was fifteen years old and has made her home in Los Angeles, California with her sister since 2019. She is a derivative beneficiary of her mother's affirmative asylum application, which has been

pending before U.S. Citizenship and Immigration Services ("USCIS") since March 2015. She is presently in civil immigration detention at the Adelanto ICE Processing Center, 10400 Rancho Road, Adelanto, California, within this District.

10. Respondent James Janecka, Warden/Facility Administrator of Adelanto ICE Processing Center ("Adelanto"), is Petitioner's immediate custodian and an employee of The GEO Group, Inc., the private prison corporation that operates Adelanto. Mr. Janecka is responsible for Petitioner's day-to-day physical custody and maintains an office within this District.

11. Respondent Thomas Giles, Field Office Director, Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO"), Los Angeles Field Office, is responsible for the administration of immigration enforcement and detention policy, including Petitioner's detention, within ICE's Los Angeles Area of Responsibility, which includes the Adelanto ICE Processing Center. Respondent is sued in an official capacity.

12. Respondent David Venturella is the Acting Director of ICE. As the senior official performing the duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in this District; and is legally responsible for pursuing any effort to detain and remove Petitioner. Respondent Venturella is sued in an official capacity.

13. Respondent Markwayne Mullin is the Secretary of the Department of Homeland Security ("DHS") and has ultimate authority over DHS. In that capacity and through his agents, Respondent Mullin has broad authority over and responsibility for the operation and enforcement of the immigration laws; routinely transacts business in this District; and is legally responsible for pursuing any effort to detain and remove Petitioner. Respondent Mullin is sued in an official capacity.

14. Respondent Todd Blanche is the Attorney General of the United States and the most senior official at the Department of Justice. In that capacity and through his agents, he is responsible for overseeing the implementation and enforcement of the federal immigration laws. The Attorney General delegates this responsibility to the Executive Office for Immigration Review

("EOIR"), which administers the immigration courts and the Board of Immigration Appeals ("BIA"). Respondent Blanche is sued in an official capacity.

## FACTUAL ALLEGATIONS

### *A. Tia came to the United States as a fifteen-year-old child, with her mother and sister, after her family fled violent persecution.*

15. Tia was born in South Africa to a Congolese family. Her family's asylum claim arises from the persecution they suffered on account of her mother's ethnicity—her mother is Banyamulenge, a targeted ethnic minority in the Democratic Republic of Congo—and the political opinion attributed to the family because of her father's political activities. Tia experienced that violence herself as a young child, and she bears the scars to this day.

16. On December 9, 2014, Tia was inspected and admitted to the United States at Atlanta, Georgia, on a visitor visa. She was fifteen years old. She did not make that journey as an adult making her own immigration decisions; she came as a child in her mother's care, alongside her younger sister. Her father traveled with the family on a visitor visa and later returned abroad. Her two older brothers were already in the United States studying—one at a college in North Carolina and the other at a military college in Pennsylvania.

17. In March 2015, Tia's mother filed an affirmative application for asylum and withholding of removal (Form I-589) with USCIS, listing Tia as a derivative beneficiary. That application remains pending today—more than eleven years later—through no fault of Tia's or her mother's.

### *B. For nearly twelve years, Tia built a life in plain view of the federal government.*

18. Based on the pending asylum application, Tia has held employment authorization from USCIS for a decade. She first used her work permit in 2016, when she got her first job. She has applied for every renewal, roughly every two years, and USCIS most recently issued her a work permit valid through February 2029. She has appeared in person at a USCIS office to provide her fingerprints and biometrics, and every employer she has worked for has verified her work authorization before hiring her.

19. Tia has paid federal income taxes every year of her adult life. She has kept her address current with the government as she moved.

20. In 2019, Tia and her sister chased artistic dreams to Los Angeles, where the two have lived together ever since. She enrolled at Santa Monica College to study theater, and took courses in film and writing, with the goal of becoming a stage and screen actress and a writer. She found a creative home in a Black-led Los Angeles nonprofit that uses the arts to teach emotional literacy, where she continued to develop her poetry, writing, and acting.

21. For the past six years, Tia has earned a living working in Los Angeles restaurants and cafés as a server and a barista. Earlier this year, she worked as the merchandise manager for a touring soul-jazz band, traveling with the band across the country to run its merchandise table at shows.

22. Tia has never hidden from the government. She has flown domestically nearly every year since arriving—more than ten times in total—presenting her identification and passing through Transportation Security Administration ("TSA") screening each time, including on several flights this year while on tour with the soul jazz band. Until October 13, 2026, no one ever stopped her.

23. Tia has never been arrested, charged with, or convicted of any criminal offense, anywhere. Her mother even lovingly recalls never having received a single complaint about Tia's behavior when she was in grade school. Declaration of Adele Nziratimana ("Nziratimana Decl.") ¶¶ 2–3. Her oldest brother calls her "a constant force of positivity" who "has followed every rule." Declaration of Bienvenu BenJiji ("B. BenJiji Decl.") ¶¶ 2, 5.

24. Nor is Tia at all a flight risk. To the contrary: "Tia has a support system waiting for her. She is a loved and valued member of our family, and being separated from her has been profoundly difficult. We want nothing more than for her to be safe[.]" Declaration of Tamara Jiji ("T. Jiji Decl.") ¶ 6. Tia works full time, participates in her local theater community, does poetry, and volunteers at local church drives. *Id.* ¶ 4. Tia is deeply woven into the fabric of her family and community.

### *C. Tia appeared in person for her family's asylum interview in June 2026.*

25. After more than eleven years, USCIS finally scheduled the family's asylum interview. Tia flew to New Orleans, and on June 16, 2026, Tia appeared in person, with her mother and siblings, at the USCIS New Orleans Asylum Office. The asylum officer questioned Tia and the other derivative beneficiaries about potential bars to asylum. When the family's attorney offered the derivatives for further testimony, the officer stated that it was unnecessary because she had no concerns about Tia's mother's credibility.

26. Following the interview, the family's attorney submitted a written closing statement. USCIS later issued a Request for Evidence on a matter unrelated to Tia, and the family's attorney responded on July 8, 2026, ahead of the deadline. USCIS has not issued a decision.

### *D. Four months later, ICE arrested Tia at LAX without a warrant, without paperwork, and without explanation.*

27. On October 13, 2026, Tia drove with her younger sister to Los Angeles International Airport ("LAX") for a trip to New York.

28. The sisters passed through TSA security screening, as Tia had done many times before. Tia then stepped into a restroom. When she came out, at least five men in plain clothes were waiting for her.

29. The men asked Tia and her sister for their identification. After examining both sisters' documents, they told Tia—and only Tia—to follow them. She complied immediately and without question. She believed her sister was walking behind her.

30. The officers led Tia into an elevator. Once the doors closed, one officer told her that he was wearing a camera "for their safety and hers." He then told her that she was under arrest because she had "overstayed [her] welcome," and that they were going to detain her.

31. Tia burst into tears. She was shocked and confused: she had passed through airport security and flown across the country more times than she could easily count, and nothing like this had ever happened or been warned to her by federal government officials.

32. Inside the elevator, plain clothes officers handcuffed Tia and walked her down

through the terminal and out the arrivals level, where a white van was waiting with two more ICE officers—a man and a woman—both visibly armed.

33. At no point at the airport did any officer show Tia a warrant, mention a warrant, or give her any document of any kind.

***E. At ICE's processing center, an officer confirmed that Tia's asylum case was pending—and kept her detained anyway.***

34. The officers did not take Tia directly to Adelanto. They first took her to ICE's processing center in downtown Los Angeles, where officers recorded her information, confiscated her belongings, and allowed her one phone call to her sister. Her identification card was never returned to her.

35. Tia was placed in a holding room and waited approximately five hours before she was allowed to speak with an ICE officer. The officer told her that she had "overstayed [her] welcome."

36. Tia explained that she had a work permit and a pending asylum case before USCIS. The officer acknowledged it: "Yes, your case is pending." He offered no reason why a person with a pending asylum case, a valid work permit, and no criminal history needed to be detained. He said only that "the laws are changing."

37. The only documents ICE gave Tia were a list of pro bono legal service providers and a property receipt number for retrieving her belongings upon release. The officer told her, verbally, that her first immigration court hearing would be on October 26, 2026, and that she would be transferred to Adelanto. She was then transferred to Adelanto, where she remains.

***F. More than a week after her arrest, Tia has still not been served with a Notice to Appear, a warrant, or a custody determination.***

38. As of the filing of this Petition, Tia has not been served with a Notice to Appear (Form I-862), a Warrant for Arrest of Alien (Form I-200), or a Notice of Custody Determination (Form I-286). Before her arrest, she had never received a Notice to Appear and was not in removal proceedings.

39. On information and belief, DHS has not filed a Notice to Appear with any immigration court. Tia's case does not appear in EOIR's automated case information system. *See* Declaration of Victoria Petty ("Petty Decl.") ¶ 2.

40. On October 20, 2026—seven days after her arrest—Tia used Adelanto's internal request system to ask for a copy of her Notice to Appear. As of this Petition's filing she has received no response.

***G. Tia's detention is causing ongoing and irreparable harm.***

41. Tia is being deprived of her liberty without any permissible justification. Nothing about her circumstances suggests she is a danger to the community or a flight risk: she has no criminal history, she has lived openly at known addresses for years, she appeared in person for her asylum interview just four months ago, and she has spent nearly twelve years complying with every obligation the government imposed on her.

42. Every day Tia remains detained, she is separated from her sister, with whom she has lived for seven years, from the rest of her family, and from the community she has built in Los Angeles. She has lost the income from her work and can reach her loved ones only by the detention telephone, at times controlled by Adelanto staff.

43. Tia's absence is felt every day by the people who love her. Nziratimana Decl. ¶ 7. Her mother calls her daughter's detention "heartbreaking," explaining that "[n]o matter how old our children become, they remain our babies." *Id.* ¶ 5. Her sister says that being separated from Tia "has been profoundly difficult," T. Jiji Decl. ¶ 6, and that Tia's detention "has caused tremendous grief in her community," *id.* ¶ 5. Her friends feel it too. One says that having Tia away from home "hurts me, physically." Declaration of Sydni Taylor ("Taylor Decl.") ¶ 6. Another, who has already missed one of their weekly film nights since her arrest, describes the separation as "catastrophic." Declaration of Isaiah Thomas ("Thomas Decl.") ¶ 2. Her family also fears what detention is doing to her. Given the trauma she endured as a child, her oldest brother is "worried about the long-term effect this detention will have on her." B. BenJiji Decl. ¶ 3. Her family wants "nothing more than for her to be safe, to be able to address her legal circumstances with dignity,

and to come home to the people who love and support her." T. Jiji Decl. ¶ 6.

44. Tia's detention also isolates her from her family's pending asylum case. Her eligibility for asylum rests on her mother's application and the family's shared history and evidence. Detaining her—alone among the derivatives—while that application remains undecided disrupts the family's ability to see their case through together.

45. Beyond the devastation of family separation, life in detention is taking a serious toll on Tia. Adelanto is currently the subject of an active federal lawsuit, *L.T. v. U.S. Immigration & Customs Enforcement*, No. 5:26-cv-00322 (C.D. Cal. filed Jan. 26, 2026), in which detainees allege, and a federal court in this District has found credible enough to warrant class-wide preliminary injunctive relief, pervasive denial and delay of medical and mental health care, contaminated drinking water, inadequate food, unsanitary housing conditions, and the excessive and punitive use of solitary confinement amid a detainee population that nearly tripled within months. These findings are corroborated by the California Attorney General's own unannounced inspection of the facility in 2025, which documented understaffing relative to Adelanto's surging population, delayed medical appointments, contaminated water in housing units, and repeated use of pepper spray, including against detainees in mental health crisis. *See id.* at ECF 44-1 (Brief of Amicus Curiae The State of California, By and Through Rob Bonta, Attorney General, In Support of Plaintiffs' Motion for Preliminary Injunction). Independent reporting further shows that Adelanto now ranks among the ten facilities nationwide with the highest rate of solitary confinement placements. *See* Julia Barajas et al., *Adelanto ICE Facility's Use of Solitary Confinement Is Among 10 Highest in US, Data Shows*, LAist (Apr. 3, 2026). Living under these conditions—conditions a federal court has already found serious enough to warrant emergency, facility-wide relief—compounds the harm of Tia's separation from her family.

## LEGAL BACKGROUND

**Constitutional Due Process**

46. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or

permanent." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). These due process rights are both substantive and procedural.

47. First, "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), including "the exercise of power without any reasonable justification in the service of a legitimate government objective," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

48. These protections extend to noncitizens facing detention, as "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Accordingly, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

49. Substantive due process thus requires that all forms of civil detention—including immigration detention—bear a "reasonable relation" to a non-punitive purpose. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972). The Supreme Court has recognized only two permissible non-punitive purposes for immigration detention: ensuring a noncitizen's appearance at immigration proceedings and preventing danger to the community. *Zadvydas*, 533 U.S. at 690–92; *see also Demore v. Kim*, 538 U.S. 510, 519–20, 527–28, 531 (2003).

50. Second, the procedural component of the Due Process Clause prohibits the government from imposing even permissible physical restraints without adequate procedural safeguards.

51. Generally, "the Constitution requires some kind of a hearing before the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). This is so even in cases where that freedom is lawfully revocable. *See Hurd v. D.C. Gov't*, 864 F.3d 671, 683 (D.C. Cir. 2017) (citing *Young v. Harper*, 520 U.S. 143, 152 (1997) (re-detention after pre-parole conditional supervision requires pre-deprivation hearing)); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (same, in parole context).

52. Once a protected liberty interest is established, courts determine the requisite process by applying the flexible balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which weighs (1) the private interest affected; (2) the risk of erroneous deprivation through existing procedures and the value of additional safeguards; and (3) the government's interest, including the administrative burden additional procedures would impose. *Haygood v. Younger*, 769 F.2d 1350, 1357 (9th Cir. 1985) (en banc) (citing *Mathews*, 424 U.S. at 335).

53. All three *Mathews* factors favor Tia, as courts in this District have repeatedly held on materially indistinguishable facts.

54. **Her private interest is profound.** She has lived at liberty in this country since she was a child, for nearly twelve years, with the government's knowledge and permission to work. A family asylum application that the government itself has left undecided for over a decade remains pending. Courts in this District have "found a substantial liberty interest in circumstances where noncitizens commenced immigration proceedings, such as applying for asylum, and the government chose not to detain them." *Yao*, 2026 WL 2666861, at *4. That interest arises from "the government's decision not to detain her or otherwise impede her liberty while exercising authority over her for purposes of adjudicating her application for immigration relief." *Id.* That is exactly Tia's situation as a derivative on her mother's application. "The length of Petitioner's freedom pending the adjudication of her asylum application only strengthens her interest in her continued freedom from immigration detention." *Cardenas*, 2026 WL 2722730, at *3. Tia's nearly twelve years far exceed the periods these courts found sufficient: about two years in *Cardenas*, three in *Lyu*, and nine in *Liping Lin*. *See Cardenas*, 2026 WL 2722730, at *3–4; *Lyu*, 2026 WL 2681631, at *3; *Liping Lin*, 2026 WL 2692175, at *5. An expired visa does not diminish that interest. *Hakobyan* rejected the government's argument that "as an individual who overstayed his nonimmigrant visa, Petitioner does not have a conditional liberty interest protected by the Due Process Clause." 2026 WL 2985380, at *2. Like the petitioners in *Ren*, Tia "developed a substantial liberty interest in remaining out of custody based on [her] lawful admission into the United States and the community ties [she] established since [her] admission." 2026 WL 2413320,

at *3. Her family and community attest to how essential she is to their lives and are ready to support her on release.

55. **The risk of erroneous deprivation was total.** Tia received no process of any kind: no warrant, no notice, no paperwork, no hearing. Where a noncitizen with a protected liberty interest "was detained without notice and a pre-detention hearing," "there is a high risk of erroneous deprivation of liberty." *Hakobyan*, 2026 WL 2985380, at *3. Here, as in *Cong*, "the record contains no neutral custody determination and no finding that Petitioner presents a risk of flight or a danger to the community." 2026 WL 2692173, at *5 (agreeing that "[t]he risk of erroneous deprivation under a regime that provides no hearing at all is total"). That matters because civil immigration detention "is permissible only to reduce the risk of flight or danger to the community." *Ma*, 2026 WL 3034590, at *3. The only explanation ICE has offered, that "the laws are changing," has nothing to do with either. Nor has anything changed about Tia: she was no more a flight risk or a danger on the day of her arrest than during the nearly twelve years the government left her at liberty, including four months earlier, when she appeared in person at the asylum office. *See Garro Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1035–36 (N.D. Cal. 2025) (finding a "significant risk that the government will erroneously deprive" a noncitizen of liberty without a pre-detention hearing, where the government identified no changed circumstances bearing on her dangerousness or flight risk).

56. **The government's interest in dispensing with notice and a hearing is minimal.** "Respondents' interest in detaining Petitioner and the burden of a pre-detention hearing are both minimal." *Cardenas*, 2026 WL 2722730, at *4; *accord Ma*, 2026 WL 3034590, at *3. The government's interest is further "diminished where, as here, Petitioner has a pending asylum application, . . . received employment authorization, and has no criminal record." *Xin Lin*, 2026 WL 2743118, at *4. ICE knew exactly who Tia was and where to find her, and it had seen her in person at the asylum office four months earlier. *Cf. Lyu*, 2026 WL 2681631, at *3 ("[T]he Government knew exactly where Petitioner was but permitted her to remain at liberty."). "In immigration court, custody hearings are routine and impose a minimal cost," and Respondents

"are routinely able to comply with orders requiring that such a hearing be held within seven days." *Tang*, 2026 WL 2666872, at *5. "The effort and cost required to provide Petitioner with procedural safeguards before detention—rather than simply detaining her without a hearing—is minimal." *Xin Lin*, 2026 WL 2743118, at *5.

57. All three *Mathews* factors favor Tia, and she "was entitled to a pre-deprivation hearing before being detained." *Ma*, 2026 WL 3034590, at *4. Because "a post-detention bond hearing is insufficient to cure" that violation, *Lyu*, 2026 WL 2681631, at *4 (citation omitted), the remedy is release, which "restores the status quo that was in effect before Respondents violated Petitioner's due process rights," *Tang*, 2026 WL 2666872, at *5. This Court should thus order Tia's immediate release and enjoin Respondents from re-detaining her without notice and a pre-deprivation hearing before a neutral decisionmaker, at which Respondents must prove by clear and convincing evidence that she is a flight risk or a danger. *See Ma*, 2026 WL 3034590, at *4; *Tang*, 2026 WL 2666872, at *6; *Ren*, 2026 WL 2413320, at *4–5.

**8 U.S.C. §§ 1226(a), 1357, And Related Regulations**

58. Tia's arrest also violated the Immigration and Nationality Act and its implementing regulations. Tia's detention could be governed, if by any statute, only by 8 U.S.C. § 1226(a). She is not an "applicant for admission" subject to 8 U.S.C. § 1225(b): she was inspected and admitted on a visitor visa nearly twelve years ago, and she was apprehended in the interior of the United States, at a domestic airport terminal, while traveling between two U.S. cities. *See Rodriguez Vazquez v. Bostock*, 183 F.4th 1160 (9th Cir. 2026) (noncitizens apprehended in the interior of the United States are subject to the detention regime of § 1226).

59. Section 1226(a) is not a blank check. It authorizes arrest and detention only "[o]n a warrant issued by the Attorney General," and only "pending a decision on whether the [noncitizen] is to be removed from the United States." 8 U.S.C. § 1226(a). Its implementing regulations, 8 C.F.R. §§ 236.1 and 1236.1, impose "multiple levels of 'substantial procedural protections' against the erroneous deprivation of [] liberty." *Zurita Navarro v. Warden, Cent. Valley Annex Det. Facility*, No. 1:26-cv-05661-DAD-SCR (HC), 2026 WL 2294963, at *1 (E.D. Cal. Aug. 10, 2026)

(quoting *Garcia-Maya v. Blanche*, No. 2:26-cv-01513-RFB-BNW, 2026 WL 1965886, at *5 (D. Nev. July 7, 2026)). Those protections include that a noncitizen "cannot be arrested without an administrative warrant or detained without notice of the basis for their detention through a notice to appear"; that an authorized ICE officer "conduct an initial custody determination at the outset of detention"; and that, at that determination, the noncitizen have the opportunity to "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding." *Id.*; 8 C.F.R. § 1236.1(c)(8).

60. Because § 1226(a) authorizes detention only while a removal decision is "pending," and because a Notice to Appear is what "initiates removal proceedings," "without a valid NTA in place, removal proceedings are not pending, and Respondents have no authority to make an arrest or effectuate detention pursuant to § 1226(a)." *Loaeza v. Bausch*, -- F. Supp. 3d --, No. 26-CV-00945-MAV, 2026 WL 2150155, at *1 (W.D.N.Y. July 27, 2026). The regulation says the same: a noncitizen may be arrested on a Form I-200 warrant "[a]t the time of issuance of the notice to appear, or at any time thereafter." 8 C.F.R. § 1236.1(b)(1); *see also* 8 C.F.R. § 1003.14(a). In *Loaeza*, the court ordered release where the Notice to Appear was generated hours after the arrest, served five days later, and filed with the immigration court more than a week later. 2026 WL 2150155, at *2.

61. Courts have held that each of the following failures to comply with § 1226(a) and § 1236.1 independently requires release: (1) failing to arrest pursuant to a warrant issued before or at the time of arrest; (2) failing to issue a Notice to Appear before or at the time of detention; (3) failing to make an initial custody determination before or at the time of detention; (4) failing to give the noncitizen an opportunity to show the officer that release would pose no danger or flight risk; and (5) failing to tell the noncitizen the basis for continued detention. *Zurita Navarro*, 2026 WL 2294963, at *2 (collecting cases); *accord Perez Esteban v. Warden, Cent. Valley Annex*, No. 1:26-cv-08235-DAD-AC (HC), 2026 WL 3151073, at *2 (E.D. Cal. Oct. 20, 2026) (ordering release where the government could not produce a warrant or initial custody determination); *Terrero v. Tsoukaris*, No. 26-cv-00869 (NCM), 2026 WL 607917, at *2–3 (E.D.N.Y. Mar. 4,

2026) (ordering release of visa overstay where ICE decided to detain him without first giving him an opportunity to demonstrate his suitability for release). As the Eastern District of New York put it, ICE "[d]oes not have free-ranging ability to arrest and detain people, and figure out the reasons later." *Gopie v. Lyons*, No. 25-cv-05229-SJB, 2025 WL 3167130, at *3 (E.D.N.Y. Nov. 13, 2025) (quoted in *Zurita Navarro*, 2026 WL 2294963, at *2).

62. Nor can the government cure these failures after the fact. "[F]ailure to comply with the procedures set forth by 8 U.S.C. § 1226(a) and its implementing regulations during a petitioner's initial detention renders that detention unlawful and that unlawfulness cannot be cured through belated compliance with statutory requirements." *Zurita Navarro*, 2026 WL 2294963, at *2; *see J.T.G. v. Genalo*, No. 26 Civ. 4521 (AT), 2026 WL 1724325, at *4 (S.D.N.Y. June 15, 2026) (custody determination issued three weeks after arrest "does not undo the constitutional violation caused by [the] initial unlawful detention").

63. Congress permits immigration officers to arrest without a warrant only where the officer has reason to believe the person is removable *and* "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. § 287.8(c)(2)(ii). And when ICE does make a warrantless arrest, its own regulations require it, within 48 hours, to determine whether the person will remain in custody or be released, and whether a Notice to Appear and warrant of arrest will be issued. 8 C.F.R. § 287.3(d).

64. This District has recently applied these requirements to ICE's warrantless arrests in the Los Angeles area. In *Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP, 2026 WL 2751388 (C.D. Cal. Sept. 2, 2026) (amended order granting in part preliminary injunction re: warrantless arrests), the court held that the "reason to believe" standard of § 1357(a)(2) and § 287.8(c)(2)(ii) is the equivalent of probable cause and requires an individualized determination "particularized with respect to th[e] person" arrested, based on the facts known to the officer at the time of arrest. *Id.* at *18 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). The court further held that an officer may not find a likelihood of escape based on unlawful status alone, because that reading would render the statute's separate likelihood-of-escape requirement superfluous. *Id.*

at *19. Finding that the government likely had a policy of conducting warrantless arrests without the required escape-risk analysis, the court issued a preliminary injunction governing warrantless immigration arrests in this District, which was in effect when Tia was arrested. *Id.* at *31.

65. An agency must follow its own regulations, and action taken in violation of them is unlawful. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir. 2004).

66. And most importantly, the Constitution required that Tia receive notice and an opportunity to be heard before, not after, she was deprived of her liberty, and she received neither.

**EXHAUSTION**

67. The Ninth Circuit confirmed in *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) that administrative exhaustion in the immigration habeas context "is prudential, not jurisdictional." Because it is prudential, a district court retains discretion to require or waive it. Under *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007), courts consider three factors when deciding whether to impose prudential exhaustion: (1) whether agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) whether relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) whether administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

68. Even when all three *Puga* factors favor imposing exhaustion as a matter of discretion, *Laing v. Ashcroft*, 370 F.3d 994 (9th Cir. 2004), established that waiver remains appropriate "where administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Hernandez*, 872 F.3d at 988 (quoting *Laing*).

69. None of the *Puga* factors weigh in favor of requiring Tia to exhaust administrative avenues for her immediate release.

70. On factor one, the existing record shows that Tia has no criminal history, was lawfully admitted to the United States as a child, has held federal work authorization for a decade,

appeared in person for her asylum interview in June 2026, and was arrested while traveling openly under her own name. No additional agency "expertise" is needed to reach a proper decision on this record. Release is the only proper decision, because the record already in Respondents' possession shows that Tia poses no danger or flight risk. *See Zadvydas*, 533 U.S. at 690.

71. On factor two, waiving exhaustion would not encourage anyone to bypass the administrative scheme. Tia's claim is that the Constitution required process *before* she was jailed; no after-the-fact proceeding before an immigration judge can supply that, and immigration judges and the BIA cannot adjudicate constitutional challenges in any event. *See Padilla-Padilla v. Gonzales*, 463 F.3d 972, 977 (9th Cir. 2006) ("Because the BIA could not have addressed the Padillas' constitutional due process claim, the Padillas were not required to exhaust the issue before the BIA."). Moreover, the administrative scheme Respondents might invoke has not even been set in motion. "[A] bond hearing before an immigration judge is a 're-determination' of custody—it assumes that a valid custody determination was made in the first instance." *Terrero*, 2026 WL 607917, at *3 (quoting *Gopie*, 2025 WL 3167130, at *3); *see* 8 C.F.R. § 1236.1(d)(1). ICE has never served Tia with any initial custody determination to redetermine, and a post-deprivation bond hearing would force her "to *guess* the basis for ICE's determination that [s]he is dangerous or a flight risk and then disprove it." *Quijay Garcia v. Mattos*, No. 2:26-cv-01205-RFB-BNW, 2026 WL 1972386, at *5–8 (D. Nev. July 8, 2026) (emphasis in the original). Nor has DHS served or, on information and belief, filed a Notice to Appear. Waiver here would not foreclose any future custody hearing in connection with removal proceedings, should any ever begin.

72. On factor three, administrative review would be futile. The ICE officer who processed Tia was told, and acknowledged, that her asylum case was pending, and detained her anyway, citing only unsupported changes in law. Asking the same agency that seized her without a warrant, and has not served her with a single charging or custody document since, to voluntarily correct course would be, at best, an empty gesture. *See Laing*, 370 F.3d at 999 (waiver appropriate where "pursuit of administrative remedies would be a futile gesture").

73. The additional *Laing* considerations also favor not requiring Tia to pursue

administrative remedies. Even a prompt post-arrest custody hearing before the immigration court, or a discretionary release by ICE, would not address "the original constitutional transgression [that] occurred when ICE" detained Petitioner "without notice or a pre-deprivation hearing." *R.N.G. v. Semaia*, -- F. Supp. 3d --, No. 26-cv-2839, 2026 WL 2089544, at *3, *9 (C.D. Cal. July 14, 2026) (waiving prudential exhaustion and ordering immediate release); *see also Domingo v. Kaiser*, No. 25-cv-05893 (RFL), 2025 WL 1940179, at *3 (N.D. Cal. July 14, 2025) ("Even if Petitioner-Plaintiff received a prompt post-detention bond hearing under 8 U.S.C. § 1226(a) and was released at that point, he will have already suffered the harm that is the subject of his motion: that is, his potentially erroneous detention."). And every additional day in detention is itself irreparable injury.

74. The administrative process Respondents might point to is also inadequate and futile in practice for several reasons. *See Laing*, 370 F.3d at 1000.

75. First, despite that there is no evidence that Tia is a flight risk or danger, at a bond hearing under § 1226(a), she would bear the burden of proving to the immigration judge's satisfaction that she is neither a danger nor a flight risk. *Matter of Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006); *Matter of Adeniji*, 22 I. & N. Dec. 1102, 1112–13 (BIA 1999) (applying 8 C.F.R. § 236.1(c)(8) to bond redeterminations).

76. Second, Courts across this Circuit have found that immigration judges have repeatedly failed to provide constitutionally adequate bond hearings, even when federal courts have ordered them. *Mubanga v. Mullin*, 837 F. Supp. 3d 1160, 1162–63 & n.3 (S.D. Cal. 2026) (collecting cases). Courts have described "the mounting evidence" that these hearings "have preordained outcomes." *Id.* at 1162 (quoting *Singh v. Valdez*, No. 26-CV-1109-WJM, 2026 WL 890240, at *5 (D. Colo. Apr. 1, 2026)). EOIR's own data confirms it. In the first half of 2026, immigration judges nationwide granted bond in only 33.5% of contested cases, 10.3 percentage points below the same period in 2025. Denials made up 53.3% of all completed bond records, the first half-year in which denials exceeded half. Petty Decl. Ex. A, Declaration of Zabdi J. Salazar ("Salazar Decl.") ¶ 13 & Ex. B, Table 2. At the Adelanto Immigration Court, which would hear

any bond request by Petitioner, the grant rate in the second quarter of 2026 was just 24.3%, and denials made up 60.4% of all completed bond records. *Id.*, Ex. B, Table 16. Even when Adelanto judges grant bond, they set it high: the average bond in that quarter was $17,045, and one in ten exceeded $30,000. *Id.* ¶ 20 & Ex. B, Table 16.

77. Third, an appeal of any adverse bond decision would offer no timely relief. "As of the end of fiscal year 2025, the BIA had 202,946 total pending appeals—a significant increase over its backlog at the end of 2024, suggesting that a bond appeal would take longer than the average 200-day period in 2024." *Maldonado v. Mullin*, No. 2:26-cv-05168-BFM, 2026 WL 1625355, at *2 (C.D. Cal. June 2, 2026) (citing EOIR data and excusing exhaustion); *Padilla Paz v. Hernandez*, 833 F. Supp. 3d 1180, 1187 (W.D. Wash. 2026) (same). Petitioner would spend months in detention waiting for a decision from a body that has no authority to decide the constitutional claims she raises here.

78. The Court should exercise its discretion to excuse any prudential exhaustion of administrative remedies and proceed to the merits of Tia's claims, which demonstrate that both the Constitution and the government's own rules require her immediate release.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Fifth Amendment to the United States Constitution
### (Substantive Due Process)

79. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

80. The Due Process Clause of the Fifth Amendment protects all "person[s]" from deprivation of liberty "without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

81. Immigration detention is constitutionally permissible only when it furthers the government's legitimate goals of ensuring the noncitizen's appearance during removal proceedings and preventing danger to the community. *See id.*

82. Tia has no criminal history and has never been arrested for or charged with any offense. She has lived openly in the United States since she was fifteen, has worked with federal authorization for a decade, has paid her taxes, and appeared in person for her asylum interview four months before her arrest. Her affirmative derivative asylum application remains pending for her family who is seeking to remain in the United States for protection from brutal violence. Nothing about her conduct or circumstances suggests she is a danger to the community or a flight risk.

83. The only reasons ICE has offered for detaining Tia—that "the laws are changing,"—bear no relation to either permissible purpose.

84. Tia's continued detention thus does not serve any legitimate governmental purpose. Accordingly, her detention violates the Due Process Clause.

**SECOND CLAIM FOR RELIEF**
**Violation of the Fifth Amendment to the United States Constitution**
**(Procedural Due Process)**

85. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

86. The Fifth Amendment guarantees noncitizens present in the country due process rights, including the right not to be deprived of a liberty interest without notice and a hearing before a neutral decisionmaker.

87. Tia's nearly twelve years of liberty in the United States, with the government's knowledge and authorization to work, continuous domestic air travel, and her good-faith participation in a family asylum case the government has kept pending for over a decade, gave rise to a protected liberty interest in her continued freedom from detention. She was arrested without any advance notice, and without any hearing before a neutral decisionmaker at which the government was required to justify depriving her of that liberty.

88. The manner of Tia's arrest compounds the due process violation. She was seized moments after clearing federal security screening under her own name—screening she had passed without incident many times before, and driven away without a warrant or a single piece of paper.

More than a week later, the government still has not told her in writing why she is being held or what charges, if any, she faces.

89. The government has no legitimate interest in detaining a person who is neither a danger nor a flight risk without first affording her notice and a hearing, and providing such process is, at most, a *de minimis* administrative burden.

90. Accordingly, Respondents violated procedural due process by detaining Tia without first providing her notice and a hearing before a neutral decisionmaker at which Respondents must prove, by clear and convincing evidence, that she poses a danger or a flight risk, considering alternatives to detention and her ability to pay a bond.

**THIRD CLAIM FOR RELIEF**
**Violation of 8 U.S.C. § 1226(a) and 8 C.F.R. §§ 236.1 and 1236.1**
**(Detention Without Warrant, Notice to Appear, or Individualized Custody Determination)**

91. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

92. Because Tia was admitted to the United States and apprehended in its interior, the only statute under which Respondents could detain her is 8 U.S.C. § 1226(a). To detain her under that provision, Respondents were required to comply with § 1226(a) and its implementing regulations, 8 C.F.R. §§ 236.1 and 1236.1, at the time of her arrest. They complied with none of them.

93. **No warrant.** Section 1226(a) authorizes arrest only "[o]n a warrant issued by the Attorney General." No officer showed Tia a warrant, mentioned a warrant, or gave her a Form I-200, and she has never been served with one.

94. **No Notice to Appear.** Tia was not in removal proceedings when she was arrested. More than a week later, she still has not been served with a Notice to Appear, and on information and belief none has been filed with the immigration court. Without one, no removal decision is pending, and Respondents have no authority to make an arrest or effectuate detention pursuant to § 1226(a). Respondents' failure to serve a Notice to Appear requires release here.

95. **No initial custody determination.** ICE made no custody determination before or

at the time it seized Tia, and has never served her with a Notice of Custody Determination.

96. **No opportunity to be heard.** No officer gave Tia an opportunity "to demonstrate to the satisfaction of the officer that . . . release would not pose a danger to property or persons, and that [she] is likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). When she told the processing officer that her asylum case was pending—the very kind of information § 1236.1(c)(8) exists to consider—he confirmed it and detained her anyway. *See Terrero*, 2026 WL 607917, at *3 ("Custody determinations made under § 1226(a) without any opportunity for the detainee to demonstrate his suitability for release are not lawful even if they were based on information particular to the detainee.").

97. **No basis for detention.** ICE has never told Tia, in writing or otherwise, any basis for her detention relevant to danger or flight. The only reasons offered—that she had "overstayed [her] welcome," and that "the laws are changing,"—are not individualized findings at all. A determination resting on immigration status alone "comports not with [§] 1226(a), but with [the government's] desired policy of mandatory detention." *J.T.G.*, 2026 WL 1724325, at *4 n.4 (quoting *Pastrana-Beltran v. Mullin*, No. 26 Civ. 2657, 2026 WL 1398609, at *2 (E.D.N.Y. May 19, 2026)).

98. Each of these failures independently renders Tia's detention unlawful. Any warrant, Notice to Appear, or custody form Respondents may generate or produce now cannot cure an arrest and detention that were unlawful from the outset. Nor may the Court accept a post hoc rationalization offered for the first time in this litigation.

99. The appropriate remedy is Tia's immediate release.

**FOURTH CLAIM FOR RELIEF**
**Violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. §§ 287.3(d) and 287.8(c)(2)**
**(Unlawful Warrantless Arrest; *Accardi* Doctrine)**

100. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

101. To the extent Respondents contend they arrested Tia without a warrant under their warrantless-arrest authority, that arrest was unlawful. The statute and regulations permit a

warrantless arrest only where an officer has reason to believe the person is likely to escape before a warrant can be obtained. 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(ii). No such reason existed. Tia had lived at a known address for years, appeared in person before USCIS four months earlier, and was traveling under her own name on a domestic flight between two U.S. cities. Respondents had every opportunity to seek a warrant and serve her with process, and did not.

102. ICE's own guidance confirms the point. Under the January 2026 memorandum issued by then–Acting ICE Director Todd Lyons, a person is "likely to escape" only if the officer determines that she is unlikely to be located at the scene of the encounter *or another clearly identifiable location* once an administrative warrant is obtained. Tia had such a location: the home address she had kept current with the government. Before arresting her, the officers examined her identification, which tied her to government records reflecting her identity, her address, her decade of work authorization, and her pending asylum case. Whether the officers came to the airport looking for her or identified her on the spot, nothing about a young woman with a known home, flying under her own name to another U.S. city, suggested she would disappear before a warrant could issue.

103. The only reason any officer gave Tia for her arrest was that she had "overstayed [her] welcome." That is a statement about immigration status, not escape risk, and status alone cannot supply the separate likelihood-of-escape finding the statute requires. On information and belief, Respondents did not make, and did not document, any individualized likelihood-of-escape determination before arresting Tia.

104. Respondents also failed to make and serve the custody determination required within 48 hours of a warrantless arrest. 8 C.F.R. § 287.3(d). More than a week after her arrest, Tia has received no Notice of Custody Determination and no determination of whether a Notice to Appear and warrant will issue.

105. Because Respondents have disregarded the statutory and regulatory conditions on their authority to arrest and detain, Tia's custody is unlawful and must end.

## **PRAYER FOR RELIEF**

Petitioner respectfully requests that this Court:

1. Assume jurisdiction over this matter;
2. Issue a writ of habeas corpus (a) ordering Respondents to immediately release Petitioner without any new conditions and/or electronic monitoring, and (b) directing Respondents to provide Petitioner a prompt hearing before a neutral decisionmaker prior to any future arrest at which the government bears the burden of proving, by clear and convincing evidence, that Petitioner is a flight risk or a danger to the community, considering alternatives to detention and Petitioner's financial ability to pay a bond;
3. Declare that Respondents' arrest and detention of Petitioner violated the Fifth Amendment, 8 U.S.C. §§ 1226(a) and 1357(a)(2), and/or 8 C.F.R. §§ 236.1, 287.3, 287.8, and 1236.1;
4. Order Respondents to return any of Petitioner's personal property confiscated at the time of her arrest and detention;
5. Award Petitioner her costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412; and
6. Grant such further relief as the Court deems just and proper.

Date: October 23, 2026

Respectfully Submitted,

*/s/ Victoria Petty*
Victoria Petty
vpetty@lccrsf.org
Lawyers' Committee for Civil Rights of the San Francisco Bay Area
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: (415) 543-9444

*Pro Bono* Attorney for Petitioner

**VERIFICATION BY SOMEONE ACTING ON PETITIONER'S BEHALF**

**PURSUANT TO 28 U.S.C. § 2242**

I am submitting this verification on behalf of the Petitioner because I am Petitioner's attorney. As the Petitioner's attorney, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge as of the date of this filing.

Date: October 23, 2026

Respectfully Submitted,

*/s/ Victoria Petty*