UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| TIA JIJI,<br>Petitioner,<br>v.<br>JAMES JANECKA, Warden, Adelanto ICE Processing Center, et al.,<br>Respondents. | Case No. 5:26-cv-06286-DTB<br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |

## I.
## PROCEEDINGS

On October 23, 2026, petitioner Tia Jiji ("Petitioner"), represented by counsel, filed a Verified Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 ("Petition") (Docket No. 1), accompanied by six declarations (Docket Nos. 1-1 through 1-6).

The Petition alleges the following claims for habeas relief: (1) Petitioner's detention violates her right to substantive due process under the Fifth Amendment; and (2) Petitioner's detention violates her right to procedural due process under the Fifth Amendment; (3) Petitioner's detention violates 8 U.S.C. § 1226(a) and 8 C.F.R.

§§ 236.1 and 1236.1; and (4) Petitioner's detention violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. §§ 287.3(d) and 287.8(c)(2). (Docket No. 1 at 21-25.[1]

On October 30, 2026 (pursuant to General Order 26-05's expedited briefing schedule, see Docket No. 4), Respondents filed an Answer to the Petition ("Answer") (Docket No. 9), and three supporting exhibits (Docket No. 9 at 6-12). In the Answer, Respondents allege that Petitioner is lawfully detained and she should not be released as this is her first detention for overstaying her visa. (Id. at 2).

On November 2, 2026, Petitioner filed a Reply (Docket No. 10), along with one supplemental declaration (Docket No. 10-1).

Thus, this matter is now ready for decision. For the reasons set forth below, the Court grants the Petition.

## II.

## BACKGROUND[2]

Petitioner was born in South Africa to a Congolese family. (Petition at ¶ 15). She came to the United States as a fifteen-year-old child, with her mother and sister, after her family fled violent persecution. (Id. at 6). Her family's asylum claim arises from the persecution they suffered on account of her mother's ethnicity - her mother is Banyamulenge, a targeted ethnic minority in the Democratic Republic of Congo - and the political opinion attributed to the family because of her father's political activities. (Id. at ¶ 15). Petitioner experienced that violence herself as a young child, and she bears the scars to this day. (Id.).

On December 9, 2014, Petitioner was inspected and admitted to the United States at Atlanta, Georgia, on a visitor visa. (Id. at ¶ 16). She did not make that journey as an adult making her own immigration decisions; she came as a child in

---

[1] For the parties' pleadings, the Court cites to the CM/ECF pagination at the top of each page.

[2] The Background is based on the allegations in the Petition.

her mother's care, alongside her younger sister. (Id.). Petitioner's father traveled with the family on a visitor visa and later returned abroad. (Id.). Her two older brothers were already in the United States studying - one at a college in North Carolina and the other at a military college in Pennsylvania. (Id.).

In March 2015, Petitioner's mother filed an affirmative application for asylum and withholding of removal (Form I-589) with USCIS, listing Petitioner as a derivative beneficiary. (Id. at ¶ 17). That application remains pending today - more than eleven years later - through no fault of Petitioner's or her mother's. (Id.).

Based on the pending asylum application, Petitioner has held employment authorization from USCIS for a decade. (Id. at ¶ 18). She first used her work permit in 2016, when she got her first job. (Id.). Petitioner has applied for every renewal, roughly every two years, and USCIS most recently issued her a work permit valid through February 2029. (Id.). She has appeared in person at a USCIS office to provide her fingerprints and biometrics, and every employer she has worked for has verified her work authorization before hiring her. (Id.).

Petitioner has paid federal income taxes every year of her adult life. (Id. at ¶ 19). She has kept her address current with the government as she moved. (Id.).

In 2019, Petitioner and her sister chased artistic dreams to Los Angeles, where the two have lived together ever since. (Id. at ¶ 20). She enrolled at Santa Monica College to study theater, and took courses in film and writing, with the goal of becoming a stage and screen actress and a writer. (Id.). She found a creative home in a Black-led Los Angeles nonprofit that uses the arts to teach emotional literacy, where she continued to develop her poetry, writing, and acting. (Id.).

For the past six years, Petitioner has earned a living working in Los Angeles restaurants and cafés as a server and a barista. (Id. at ¶ 21). Earlier this year, she worked as the merchandise manager for a touring soul-jazz band, traveling with the band across the country to run its merchandise table at shows. (Id.).

Petitioner has never hidden from the government, has flown domestically nearly every year since arriving - more than ten times in total - presenting her identification and passing through Transportation Security Administration ("TSA") screening each time, including on several flights this year while on tour with the soul jazz band. (Id. at ¶ 22).

Petitioner has never been arrested, charged with, or convicted of any criminal offense, anywhere. (Id. at ¶ 23). Nor is she a flight risk. (Id. at ¶ 24). Petitioner works full time, participates in her local theater community, does poetry, and volunteers at local church drives. (Id.). She is deeply woven into the fabric of her family and community. (Id.).

After more than eleven years, USCIS finally scheduled the family's asylum interview. (Id. at ¶ 25). Petitioner flew to New Orleans, and on June 16, 2026, she appeared in person, with her mother and siblings, at the USCIS New Orleans Asylum Office. (Id.). The asylum officer questioned Petitioner and the other derivative beneficiaries about potential bars to asylum. (Id.). When the family's attorney offered the derivatives for further testimony, the officer stated that it was unnecessary because she had no concerns about Petitioner's mother's credibility. (Id.). Following the interview, the family's attorney submitted a written closing statement. (Id. at ¶ 26). USCIS later issued a Request for Evidence on a matter unrelated to Petitioner, and the family's attorney responded on July 8, 2026, ahead of the deadline. (Id.). USCIS has not issued a decision. (Id.).

On October 13, 2026, Petitioner drove with her younger sister to Los Angeles International Airport ("LAX") for a trip to New York. (Id. at ¶ 27). She and her sister passed through TSA security screening. (Id.). Petitioner then stepped into a restroom and when she came out, at least five men in plain clothes were waiting for her. (Id.). The men asked Petitioner and her sister for their identification. (Id. at ¶ 29). After examining both sisters' documents, they told Petitioner - and only

Petitioner - to follow them, which she did, without question. (Id.). Petitioner believed her sister was walking behind her. (Id.).

The officers led Petitioner into an elevator and once the doors closed, one officer told her that he was wearing a camera "for their safety and hers." (Id. at ¶ 30). He then told her that she was under arrest because she had "overstayed [her] welcome," and that they were going to detain her. (Id.). Petitioner was placed in handcuffs and escorted through the terminal and out the arrivals level. (Id. at ¶ 32). Petitioner was not shown a warrant, nor was a warrant mentioned. (Id. at ¶ 33).

Petitioner was first taken to ICE's processing center in downtown Los Angeles, where officers recorded her information, confiscated her belongings, and allowed her one phone call to her sister. (Id. at ¶ 34). Her identification card was never returned to her. (Id.).

As of the filing of this Petition, Petitioner has not been served with a Notice to Appear (Form I-862), a Warrant for Arrest of Alien (Form I-200), or a Notice of Custody Determination (Form I-286). (Id. at ¶ 38).

Petitioner's detention isolates her from her family's pending asylum case, and her eligibility for asylum rests on her mother's application and the family's shared history and evidence. (Id. at ¶ 44).

As of the date of the filing of the Petition, Petitioner remains in immigration detention. (Id. at ¶ 3; https://locator.ice.gov/odls/#/results).

## III.

## LEGAL AUTHORITY

A writ of habeas corpus is "available to every individual detained within the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." Preiser v. Rodriguez, 411 U.S. 475, 484 (1973).

A court may grant a writ of habeas corpus to a petitioner who demonstrates to be in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). Traditionally, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." I.N.S. v. St. Cyr, 533 U.S. 289, 301 (2001). A noncitizen in the custody of immigration authorities may bring a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on the grounds of their detention violates the Constitution or other federal laws. 28 U.S.C. § 2241(c)(3); Zadvydas v. Davis, 533 U.S. 678, 687-88 (2001) (federal courts retain jurisdiction to consider habeas relief under Section 2241 for noncitizens subject to detention following an order of removal).

Here, Petitioner has raised claims under the Due Process Clause of the Fifth Amendment. The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law. See U.S. Const., amend. V. These protections extend to noncitizens present in the United States. See, e.g., Trump v. J.G.G., 604 U.S. 670, 673 (2025) (*per curiam*) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (internal quotation marks omitted)); Zadvydas, 533 U.S. at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); Hussain v. Rosen, 985 F.3d 634, 642 (9th Cir. 2021) ("The Fifth Amendment entitles aliens to due process of law in deportation proceedings." (internal quotation marks and brackets omitted)). Indeed, "the government's discretion to incarcerate noncitizens is always constrained by the requirements of due process . . . ." Hernandez v. Sessions, 872 F.3d 976, 981 (9th Cir. 2017).

Due process "is a flexible concept that varies with the particular situation." Zinermon v. Burch, 494 U.S. 113, 127 (1990). Indeed, the Due Process Clause provides both procedural and substantive protections. See, e.g., Regino v. Staley,

133 F.4th 951, 959 (9th Cir. 2025) ("This clause protects individuals against two types of government action: violations of substantive due process and procedural due process." (internal quotation marks omitted)). To determine whether detention violates procedural due process, courts frequently apply the three-part test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976). See Rodriguez Diaz v. Garland, 53 F.4th 1189, 1206 (9th Cir. 2022) (collecting cases and applying the Mathews test to a constitutional challenge to detention pursuant to 8 U.S.C. § 1226(a)). Under Matthews, courts weigh the following three factors: (1) "[T]he private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335; see also id. at 332 ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.").

## IV.

## DISCUSSION

### A. Petitioner is Entitled to Habeas Relief.

Petitioner claims that her arrest and detention on October 13, 2026, without any pre-deprivation notice or hearing, constituted a violation of due process under the Fifth Amendment. (See Petition at 21-23). Petitioner alleges that she lawfully entered the United States on December 9, 2014, on a Visitor's Visa, and thereafter, in March 2015, was included as a derivative beneficiary on her mother's application for asylum. (Id. at 6). That application remains pending, more than eleven years later. (Id.).

Respondents do not dispute these facts. Thus, for more than eleven years, Petitioner has been living openly in the community pursuing lawful immigration relief. She has followed the law and pursued her available remedies, all with the knowledge and permission of Respondents. She applied for and obtained employment authorization during the pendency of her asylum application. She has paid taxes and forged community ties, all while providing the government with current contact information and location.

During this period, the government elected not to detain Petitioner despite exercising authority over her through the asylum process and, instead, allowed her to remain at liberty in the community.

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process Clause] protects." Zadvydas, 533 U.S. at 690. The protection afforded by the Due Process Clause runs to citizens and noncitizens alike. J.G.G., 604 U.S. at 673 (quoting Reno v. Flores, 507 U.S. 292, 306 (1993)) (cleaned up) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings."). Evaluating the contours of Petitioner's due process rights proceeds in two steps: "[T]he first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution." Garcia v. Andrews, Case No. 2:25-cv-01884-TLN-SCR, 2025 WL 1927596, at *2 (E.D. Cal. July 14, 2025) (citing Ky. Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989)).

Here, the Court finds that Petitioner has demonstrated a protected liberty interest in remaining at liberty in the community absent sufficient justification for her re-detention, based on the government's decision not to detain her or otherwise impede her liberty while exercising authority over her for purposes of adjudicating

her application for immigration relief. Indeed, a number of federal courts in California have found a protectable liberty interest in nearly identical circumstances. See Tzoc v. LaRose, Case No. 26-cv-3965-GPC-VET, 2026 WL 2227161, at *2-3 (S.D. Cal., Aug. 3, 2026); Dai v. Janecha, Case No. 5:26-cv-03966-PD, 2026 WL 2164154, at *1-2 (C.D. Cal., July 24, 2026); E.E.O.H. v. Noem, Case No. 1:26-cv-01266-JLT-SAB-HC, 2026 WL 850363, at *4-5 (E.D. Cal. Mar. 26, 2026), report and recommendation adopted, 2026 WL 967670 (E.D. Cal. Apr. 9, 2026); Villanueva-Montanez v. Lyons, Case No. 2:26-cv-00954-DAD-CKD, 2026 WL 797930, at *1 (E.D. Cal. Mar. 23, 2026); Kalkan v. Chestnut, Case No. 1:26-cv-02028-DAD-EFB, 2026 WL 788112, at *1 (E.D. Cal. Mar. 20, 2026); Kharitonova v. Albarran, Case No. 3:26-cv-01362-JSC, 2026 WL 531441, at *2 (N.D. Cal. Feb. 25, 2026).

As demonstrated in the cases cited above, courts have found a substantial liberty interest in circumstances where noncitizens commenced immigration proceedings, and the government chose not to detain them. See also Gagik T. v. Chestnut, et al, Case No. 1:26-cv-04337-MWJS, 2026 WL 1837413 (E.D. Cal., June 25, 2026) (granting release to a noncitizen who entered the country on a visitor visa, applied for asylum, was granted employment authorization and remained out of custody for six years); Kharitonova, 2026 WL 531441 at *2 ("Although the Government did not detain and then release her, it made a decision *not* to detain her in the first place; Petitioner thus has the same liberty interest in her continued freedom as an individual who was initially detained.").

The Court finds the reasoning of these cases persuasive. Petitioner entered the United States lawfully more eleven years ago on December 9, 2014, pursuant to a Visitor Visa. (Petition at 6 ). Thereafter, Petitioner's mother filed an affirmative application for asylum and withholding of removal (Form I-589) with USCIS, listing Petitioner as a derivative beneficiary. (Id.)

Petitioner has affirmatively interacted with the government through the asylum process, providing her address and other information to USCIS. She has applied for and received employment authorization and there is nothing in the record to indicate that Petitioner failed to comply with the requests of USCIS related to her asylum application, failed to comply with any of his obligations regarding the asylum process, or that she avoided contact with the government.

Petitioner has lived openly in the community, at a known address, establishing a life in her community, with no violations of the law. Respondents have had full knowledge of Petitioner's identity, immigration status and location during the pendency of her immigration application, or since March 2015. With this knowledge, the government has continuously elected not to detain Petitioner while exercising authority over her legal proceedings, all the while permitting her to remain free and at liberty while her application was pending.

Considering the arc of the government's sustained conduct towards Petitioner, the Court finds that Petitioner developed a substantial liberty interest in continued release.

In light of this protected liberty interest, the Court turns to consider what process she is owed before the government may take that liberty interest away. Petitioner claims that due process was required before she was taken into custody. She thus argues that the appropriate habeas remedy is for her to be released back to the community. The Court agrees.

To determine what procedures are constitutionally sufficient to protect a liberty interest, the Court applies the three factors set forth in <u>Mathews</u>:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the

> fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

As discussed below, the Court finds that each of the three Mathews factors supports Petitioner's constitutional right to process before she was re-detained.

With regard to the first factor, as discussed above, the liberty interest at stake here is significant. Petitioner has a substantial interest in remaining in the community and pursuing her application for immigration relief. See Giovanny Hernan Ortega v. Erik Bonnar, et al, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) (holding that the petitioner had a substantial liberty interest where he had been released from custody for 18 months and was living with his wife, spending time with his mother and other family members, working as a bicycle mechanic, and developing friendships in his community).

Turning to the second Mathews factor, there is a significant risk that the government will erroneously deprive Petitioner of that liberty interest if it does not provide her with pre-deprivation process. The crux of due process "is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews, 424 U.S. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). And where a petitioner has not received a hearing or other process prior to the revocation of his liberty – as Petitioner alleges - "the risk of an erroneous deprivation [of liberty] is high." Singh v. Andrews, 803 F. Supp. 3d 1035, 1047 (E.D. Cal. 2025) (cleaned up).

Finally, Respondents have not articulated any countervailing government interest—the third Mathews factor—that supports providing this process only after Petitioner has been detained. Due process "usually" requires a hearing before the State deprives a person of liberty or property. Zinermon, 494 U.S. at, 127. Exceptions to that general rule are appropriate where quick action is necessary or

where it is impractical to impossible to provide pre-deprivation process. Id. at 128. But neither of those exceptions appears to be applicable to the instant circumstances. Respondents have not argued that Petitioner was an imminent risk of flight or that some other exigency required her immediate arrest and detention at Los Angeles International Airport on October 13, 2026.

In short, "[i]f the government wishes to re-arrest [Petitioner] at any point, it has the power to take steps toward doing so; but its interest in doing so without a hearing [or other procedure] is low." Ortega, 415 F. Supp. 3d at 970; see also John J. Morrissey, et al v. Lou B. Brewer, et al, 408 U.S. at 471, 483 (noting that "the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial[,] . . . [y]et, the State has no interest in revoking parole without some informal procedural guarantees"). Because each of the Mathews factors favors Petitioner's bid for pre-deprivation process, the Court finds that Petitioner's detention—which was accompanied by no process—violates the Due Process Clause.

With respect to the appropriate remedy for such a due process violation, many courts considering this issue have found that a post-detention bond hearing does not rectify the harm of a due process violation because the petitioner "will have already suffered the harm" that such petitions raise—her potentially erroneous detention. See e.g., Hasratyan v. Bondi, Case No. 5:26-cv-00210-MCS-ADS, 2026 WL 288909, at *4 (C.D. Cal. Feb. 2, 2026) (concluding that where a petitioner received a procedurally deficient post-detention bond hearing, "the post-detention process Petitioner received and will receive is no substitute for the pre-detention process she was owed"); Saballos Rosales v. Noem, Case No. 5:26-CV-00112-JWH-MBK, 2026 WL 761371, at *3 (C.D. Cal. Mar. 16, 2026) (granting TRO and finding that "the post-detention process [of a bond hearing] that Rosales did receive, and will receive, is no substitute for the pre-detention process she was owed.") (citing Hasratyan);

Charan S. v. Warden, CA City, Case No. 1:26-cv-3017, TLN-JDP, 2026 WL 1144158, at *6 (E.D. Cal. Apr. 28, 2026) ("The fact that Petitioner was provided with a post-deprivation court-ordered bond hearing does not cure the initial constitutional violation of unlawfully revoking Petitioner's liberty and detaining him without any process for nearly two months"); Domingo v. Kaiser, Case No. 25-cv-05893 (RFL), 2025 WL 1940179, at *3 (N.D. Cal. July 14 2025); see also Riveros-Sanchez v. City of Easton, 861 F. App'x 819, 822 (3d Cir. 2021) ("[I]f a pre-deprivation hearing was required, then no amount of post deprivation process could cure the . . . initial failure to provide a hearing.").

As with similar cases in this Circuit, the Court finds that the appropriate remedy in this case is to order Petitioner placed in the position she would have been absent the due process violation—that is, she should be released from custody on whatever conditions may have been previously imposed. See e.g., E.A.T.-B. v. Wamsley, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025) (granting such relief); Jasbin v. Warden, Case No. 26-cv-579-JES-BJW, 2026 WL 353354, at *4 (S.D. Cal. Feb. 9, 2026) (ordering release due to due process violation despite government's argument that the petitioner was only entitled to bond hearing as a Maldonado Bautista class member); Prior v. Chestnut, Case No. 1:25-cv-01131-JLTEPG-HC, 2026 WL 309560, at *9 (E.D. Cal. Feb. 5, 2026) (recommending immediate release as appropriate remedy for due process violation).

## V.

## ORDER

IT THEREFORE IS ORDERED that: (1) Judgment be entered granting the Petition; and (2) that a writ of habeas corpus be issued (a) requiring Respondents to immediately release Petitioner Tia Jiji (A# 206-959-795) from custody, subject to the same conditions (if any) that she was subject to at the time she was arrested and re-detained, (b) ordering Respondents to return all property confiscated from

Petitioner during her arrest and processing into detention; (c) enjoining Respondents and their officers, agents, employees, attorneys and persons acting on their behalf in concert or in participation with them, from re-detaining Petitioner without notice and a pre-detention hearing before a neutral arbiter at which the government bears the burden of proving that Petitioner is a flight risk or danger to the community; and (d) ordering Respondents to file a status report within two (2) business days to confirm that Petitioner has been released from custody pursuant to this Order.

DATED: November 10, 2026

DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE